UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHAUN MCCUTCHEON, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 12cv1034(JEB)(JRB)(RLW) |
| FEDERAL ELECTION COMMISSION, | Three-Judge Court |
| *Defendant.* | |

Before: BROWN, Circuit Judge; WILKINS, District Judge; and BOASBERG, District Judge.

MEMORANDUM OPINION

BROWN, Circuit Judge:

Congress enacted the Federal Elections Campaign Act of 1971 (FECA) to "promote fair practices in the conduct of election campaigns for Federal political offices." Pub. L. No. 92-225, preamble, 86 Stat. 3, 3 (1972). Since 1972, the law has changed significantly. The current iteration of FECA imposes contribution limits stratified to track both the identity of the contributor and the identity of the receiver. Individuals, however, cannot necessarily contribute as much as they might wish within these limits; they, and only they, must comply with a second regulatory tier: a set of aggregate contribution limits. 2 U.S.C. § 441a(a)(3). Plaintiffs Shaun McCutcheon and the Republican National Committee ("RNC") now challenge these aggregate limits as unconstitutional. We reject their challenge.

I.     **Background**

A.  Legal Background

In 1974, Congress amended FECA to prohibit persons from contributing more than $1,000 to any political candidate, individuals from contributing more than an aggregate of $25,000 in any calendar year, and political committees from contributing more than $5,000 to any political

candidate. FECA Amendments of 1974 § 101, Pub. L. No. 93-443, 88 Stat. 1263, 1263. The

Supreme Court ultimately upheld these contribution limits in the face of a First Amendment

challenge, though it struck down FECA's expenditure limits. *Buckley v. Valeo*, 424 U.S. 1, 58 (1976)

(per curiam) (summarizing holdings). A few months after the *Buckley* Court handed down its

decision, Congress amended the FECA to distinguish (1) between contributions by persons and

contributions by multicandidate political committees, and (2) among contributions to candidates and

their authorized committees, contributions to national political party committees, and contributions

to all other political committees. FECA Amendments of 1976 §§ 111, 201, Pub. L. No. 94-283, 90

Stat. 475, 486-87. Congress left the $25,000 aggregate limit on individuals' contributions untouched,

however, until the Bipartisan Campaign Reform Act of 2002 ("BCRA"), which replaced the $25,000

aggregate limit with the bifurcated limiting scheme that Plaintiffs now challenge. Section 307, Pub.

L. No. 107-155, 116 Stat. 81, 102-03. There are thus two sets of contribution limits: base limits

calibrated to the identity of the contributor regulating how much the contributor may give to

specified categories of recipients, and a set of aggregate limits regulating the total amount an

individual may contribute in any two-year election cycle. Some (but not all) of these limits are

periodically indexed for inflation. *See* 2 U.S.C. § 441a(c).

The default base limits apply to contributions by "persons," that is, individuals, partnerships,

committees, associations, corporations, unions, and other organizations. *See* 2 U.S.C. 431(11)

(defining "person"). FECA currently prohibits persons from contributing more than $2,500 per

election to any given candidate or that candidate's agent or authorized committee; more than

$30,800 in any calendar year to each of a national political party's national committee, House

campaign committee, and Senate campaign committee; more than $10,000 in any calendar year to a

state party political committee; and more than $5,000 in any calendar year to any other political

committee. 2 U.S.C. § 441a(a)(1); 11 C.F.R. § 110.1(b)-(d); 76 Fed. Reg. 8,368, 8,370 (Feb. 14, 2011) (indexing for inflation).

These base contribution limits do not limit how much a contributor can contribute as long as the contributions remain within the limits for each recipient. Under the base contribution limits, for example, an individual might contribute $3.5 million to one party and its affiliated committees in a single election cycle.[1] The aggregate limits prevent this. During each two-year period starting in an odd-numbered year, no individual may contribute more than an aggregate of $46,200 to candidates and their authorized committees or more than $70,800 to anyone else. 2 U.S.C. § 441a(a)(3); 76 Fed. Reg. at 8,370. Of that $70,800, no more than $46,200 may be contributions to political committees that are not national political party committees. 2 U.S.C. § 441a(a)(3); 76 Fed. Reg. at 8,370. These aggregate limits, which amount to a total biennial limit of $117,000, 11 C.F.R. § 110.5(b); 76 Fed. Reg. at 8,370, thus prevent individuals from contributing the statutory maximum to more than eighteen candidates.

FECA includes a number of provisions designed to prevent evasion of the various limits. First, anyone who contributes more than permitted may be subject to civil or criminal penalties. 2 U.S.C. § 437g(a), (d). Second, indirect contributions, such as earmarked contributions to an intermediary, are deemed contributions to that candidate. 2 U.S.C. § 441a(a)(8). Third, FECA prohibits contributions made in the name of someone else. 2 U.S.C. § 441f. Finally, contributions made or received by more than one "affiliated" committee are deemed to have been made or received by the same committee. 2 U.S.C. § 441a(a)(5); 11 C.F.R. §§ 100.5(g), 110.3.

---

[1]      As amici Campaign Legal Center and Democracy 21 explain, because primary and general elections held during the same calendar year count as separate elections, 11 C.F.R. §§ 100.2, 110.1(j), an individual might contribute $5,000 to each of a party's House and Senate candidates, $30,800 to each of a party's three federal party committees each year, and $10,000 to each of a party's fifty state committees a year. McCutcheon does not dispute this calculation. This $3.5 million, moreover, does not include contributions to PACs, a sum that would equal $5,000 multiplied by whatever number of PACs an individual desires to give to.

B.   Factual and Procedural Background

McCutcheon is an Alabama resident eligible to vote in a U.S. presidential election. Thus far, during the 2011-2012 election cycle, he has contributed a total of $33,088 to sixteen different candidates in amounts ranging from $1,776 to $2,500 per election; $1,776 to each of the RNC, the National Republican Senatorial Committee ("NRSC"), and the National Republican Congressional Committee ("NRCC"); $2,000 to a nonparty political committee (the Senate Conservatives Fund); and $20,000 to the federal account of a state party committee (the Alabama Republican Party). McCutcheon, however, wants to contribute more. He wants to contribute $1,776 to twelve other candidates and enough money to the RNC, NRSC, and NRCC to bring his total contributions up to $25,000 each. Doing either of these, however, would violate the aggregate limits: the additional candidate contributions would amount to aggregate candidate contributions of $54,400, and the additional party committee contributions would amount to aggregate contributions of $75,000 to national party committees. McCutcheon assures us he intends to repeat these donation patterns during future election cycles.

The RNC, meanwhile, wishes to receive contributions from individuals like McCutcheon that would be permissible under the base limits but violate the aggregate limit on contributions to party committees. Because of the aggregate limit, the RNC has both refused and returned contributions. The RNC believes that others would contribute to the RNC but for the limit. According to the verified complaint, the RNC does not control either the NRSC or the NRCC.

Plaintiffs challenge both the $46,200 aggregate limit on candidate contributions and the $70,800 aggregate limit on other contributions under the First Amendment. They challenge the $46,200 aggregate limit for being "unsupported by any cognizable government interest . . . at any level of review" and for being unconstitutionally low. They challenge the $70,800 aggregate limit facially, as applied to contributions up to $30,800 per calendar year to national party committees,

and for being too low, both facially and as applied to contributions to national party committees.
Plaintiffs also ask this Court for a preliminary injunction to enjoin Federal Election Commission
("FEC") enforcement of the aggregate limits. We consolidated the preliminary injunction hearing
with the hearing on the merits and now resolve both issues.

## II.    Discussion

### A.   Level of Scrutiny

Both contribution limits and expenditure limits implicate "the most fundamental" First
Amendment interests, but each does so in a different way. *Buckley*, 424 U.S. at 14. The Supreme
Court has accordingly applied different levels of scrutiny to each: expenditure limits are subject to
strict scrutiny, while contribution limits will be valid as long as they satisfy "the lesser demand of
being closely drawn to match a sufficiently important interest." *McConnell v. Fed. Election Comm'n*, 540
U.S. 93, 136 (2003) (quoting *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 162 (2003)), *overruled on
other grounds by Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 913 (2010). The Court has never
repudiated this distinction. *See Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806,
2817 (2011) (distinguishing between scrutiny of contributions and expenditures).

Plaintiffs argue that the aggregate limits must be subject to strict scrutiny because laws
burdening political speech are subject to strict scrutiny and the aggregate limits "similarly 'burden'
First Amendment rights." This syllogism is rooted in *Buckley* itself. The *Buckley* Court did not
unequivocally hold that political expenditures are speech. Rather, it drew on the fact that "virtually
every means of communicating ideas in today's mass society requires the expenditure of money" to
hold that "[a] restriction on the amount of money a person or group can spend on political
communication during a campaign necessarily reduces the quantity of expression by restricting the
number of issues discussed, the depth of their exploration, and the size of the audience reached."
424 U.S. at 19. Thus, the Court suggested, contribution limits might sometimes implicate rights of

expression in more than a "marginal" way, like a spiking seismograph at the onset of an earthquake. More recently, *Citizens United* proclaimed that "[l]aws that burden political speech are 'subject to strict scrutiny,' 130 S. Ct. at 898, and this Court relied on that principle to preliminarily enjoin the FEC from enforcing limits on contributions to a political committee interested in making independent expenditures, *Carey v. Fed. Election Comm'n*, 791 F. Supp. 2d 121, 125, 128 (D.D.C. 2011).[2] Although we acknowledge the constitutional line between political speech and political contributions grows increasingly difficult to discern, we decline Plaintiffs' invitation to anticipate the Supreme Court's agenda. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). Every contribution limit may "logically reduce[] the total amount that the recipient of the contributions otherwise could spend," but for now, "this truism does not mean limits on contributions are simultaneously considered limits on expenditures that therefore receive strict scrutiny." *Republican Nat'l Comm. v. Fed. Election Comm'n*, 698 F. Supp. 2d 150, 156 (D.D.C. 2010), *aff'd*, 130 S. Ct. 3544 (2010) (mem.); *see Citizens United*, 130 S. Ct. at 909 (declining to "reconsider whether contribution limits should be subjected to rigorous First Amendment scrutiny").

Plaintiffs try to escape the consequences of lesser scrutiny by arguing that the aggregate limits are actually expenditure limits, not contribution limits. Because § 441a(a)(1) already establishes base contribution limits, they say, "added biennial contribution limits are more appropriately deemed *expenditure* limits, subject to strict scrutiny." They are wrong. The difference between contributions and expenditures is the difference between giving money to an entity and spending that money

---

[2]     We note contributions for independent expenditures are a different beast altogether. The *Carey* court was constrained by the D.C. Circuit's recent decision in *SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686 (D.C. Cir. 2010), holding unconstitutional contribution limits to independent expenditure groups. *Id.* at 695.

directly on advocacy. Contribution limits are subject to lower scrutiny because they primarily implicate the First Amendment rights of association, not expression, and contributors remain able to vindicate their associational interests in other ways, *Buckley*, 424 U.S. at 22, 28; the limits primarily implicate associational rights rather than rights of expression because they impose only a "marginal" restriction on the contributor's "ability to engage in free communication," *id.* at 20; they impose only a marginal restriction on a contributor's expressive ability because the expressive value of a contribution derives from the "undifferentiated, symbolic act of communicating," *id.* at 21; and the expressive value of contributions are limited because "the transformation of contributions into political debate involves speech by someone other than the contributor," *id.* The aggregate limits do not regulate money injected directly into the nation's political discourse; the regulated money goes into a pool from which another entity draws to fund its advocacy. *See Cal. Med. Ass'n v. Fed. Election Comm'n*, 453 U.S. 182, 195-96 (1981) (rejecting "speech by proxy" argument that limit on contributions to political committee is actually expenditure limit "because it restricts the ability of [the contributor] to engage in political speech through a political committee"). To break the chain of legal consequences tied to that fact would require a judicial act we are not empowered to perform.

B.   The Merits

The government may justify the aggregate limits as a means of preventing corruption or the appearance of corruption, or as a means of preventing circumvention of contribution limits imposed to further its anticorruption interest.[3] *Buckley*, 424 U.S. at 26-27, 38. The Supreme Court has recognized no other governmental interest "sufficiently important to outweigh the First Amendment interests implicated by contributions for political speech." *SpeechNow.org*, 599 F.3d at 692.

---

[3]      Even after *Citizens United*, a number of other circuits continue to recognize anticorruption and anticircumvention as valid government interests. They likewise continue to recognize the government's interest in preventing the appearance of corruption. *See, e.g.*, *United States v. Danielczyk*, 683 F.3d 611, 618 (4th Cir. 2012); *Ognibene v. Parkes*, 671 F.3d 174, 187, 195 & n.21 (2d Cir. 2011); *Wis. Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 153 (7th Cir. 2011); *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1118, 1124-25 (9th Cir. 2011).

"Corruption," though, is a narrow term of art: "Elected officials are influenced to act contrary to

their obligations of office by the prospect of financial gain to themselves or infusions of money into

their campaigns. The hallmark of corruption is the financial *quid pro quo*: dollars for political favors."

*Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 497 (1985). Influence

over or access to elected officials does not amount to corruption. *Citizens United*, 130 S. Ct. at 910

("Democracy is premised on responsiveness." (quoting *McConnell*, 540 U.S. at 297 (Kennedy, J.,

concurring in the judgment in part and dissenting in part))).

　　*Citizens United* left unclear the constitutionally permissible scope of the government's

anticorruption interest. It both restricted the concept of quid-pro-quo corruption to bribery, *see* 130

S. Ct. at 908 ("The practices *Buckley* noted would be covered by bribery laws if a *quid pro quo*

arrangement were proved."), and suggested that there is a wheeling-and-dealing space between pure

bribery and mere influence and access where elected officials are "corrupt" for acting contrary to

their representative obligations, *see id.* at 911 (stating that there would be "cause for concern" if

elected officials "succumb to improper influences," "surrender their best judgment," and "put

expediency before principle" because of independent expenditures). Yet if anything is clear, it is that

contributing a large amount of money does not ipso facto implicate the government's anticorruption

interest. The government's assertion that large contributions "could easily exert a corrupting

influence on the democratic system" and would present "the appearance of corruption that is

'inherent in a regime of large individual financial contributions'" simply sweeps too broadly.

McCutcheon alleges that he has "deeply held principles regarding government and public policy,"

believing that "the United States is slowly but surely losing its character as an exceptional nation that

stands for liberty and limited government under the Constitution." He wants to contribute to a

number of candidates "who are interested in advancing the cause of liberty." Supporting general

principles of governance does not bespeak corruption; such is democracy. "It is in the nature of an

elected representative to favor certain policies, and, by necessary corollary, to favor the voters and contributors who support those policies." *Citizens United*, 130 S. Ct. at 910 (quoting *McConnell*, 540 U.S. at 297 (quoting *McConnell*, 540 U.S. at 297 (Kennedy, J., concurring in the judgment in part and dissenting in part))).

Plaintiffs do not, however, challenge the base contribution limits,[4] so we may assume they are valid expressions of the government's anticorruption interest. And that being so, we cannot ignore the ability of aggregate limits to prevent evasion of the base limits. *See Buckley*, 424 U.S. at 38 (upholding the $25,000 aggregate limit as "no more than a corollary of the basic individual contribution limitation that we have found to be constitutionally valid"). Circumvention, after all, can be "very hard to trace." *Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 462 (2001) ["*Colorado II*"]; *see McConnell*, 540 U.S. at 165, 224 (explaining that "[m]oney, like water, will always find an outlet," and Congress has learned "the hard lesson of circumvention" from "the entire history of campaign finance regulation"). Eliminating the aggregate limits means an individual might, for example, give half-a-million dollars in a single check to a joint fundraising committee comprising a party's presidential candidate, the party's national party committee, and most of the party's state party committees. After the fundraiser, the committees are required to divvy the contributions to ensure that no committee receives more than its permitted share, 11 C.F.R. §§ 102.6(a)(1), 110.3(c)(2), but because party committees may transfer unlimited amounts of money to other party committees of the same party, the half-a-million-dollar contribution might nevertheless find its way to a single committee's coffers. 2 U.S.C. § 441a(a)(4); 11 C.F.R. §§ 102.6(a)(1)(ii), 110.3(c)(1). That committee, in turn, might use the money for coordinated expenditures, which have no "significant functional difference" from the party's direct candidate

---

[4]     We take no position on whether plaintiffs could have done so. *See McConnell*, 540 U.S. at 229 ("This Court has no power to adjudicate a challenge to the FECA [contribution] limits because challenges to the constitutionality of FECA provisions are subject to direct review before an appropriate en banc court of appeals . . . not in the three-judge District Court convened pursuant to BCRA § 403(a).")).

contributions. *Colorado II*, 533 U.S. at 460. The candidate who knows the coordinated expenditure

funding derives from that single large check at the joint fundraising event will know precisely where

to lay the wreath of gratitude.

Gratitude, of course, is not itself a constitutionally-cognizable form of corruption, *Republican*

*Nat'l Comm.*, 698 F. Supp. 2d at 158, and it may seem unlikely that so many separate entities would

willingly serve as conduits for a single contributor's interests. But it is not hard to imagine a situation

where the parties implicitly agree to such a system, *see Colorado II*, 533 U.S. at 459 (upholding limits

on coordinate spending as a means of preventing circumvention of contribution limits because of

"informal bookkeeping" practices by which, among other things, "[d]onors would be told the

money they contributed could be credited to any Senate candidate"), and there is no reason to think

the quid pro quo of an exchange depends on the number of steps in the transaction, *see McConnell*,

540 U.S. at 155 ("[T]here is no meaningful separation between the national party committees and the

public officials who control them."). The Supreme Court has rejected the argument that Congress

cannot restrict coordinated spending as an anticircumvention measure because there are "better

crafted safeguards" in place like the earmarking rules. *Colorado II*, 533 U.S. at 462. We follow the

Court's lead and conceive of the contribution limits as a coherent system rather than merely a

collection of individual limits stacking prophylaxis upon prophylaxis.

Given our conclusion that the aggregate limits are justified, we reject Plaintiffs' arguments

that the limits are unconstitutionally low and unconstitutionally overbroad. It is not the judicial role

to parse legislative judgment about what limits to impose. *See Randall v. Sorrell*, 548 U.S. 230, 248

(2006) (plurality) ("We cannot determine with any degree of exactitude the precise restriction

necessary to carry out the statute's legitimate objectives. In practice, the legislature is better equipped

to make such empirical judgments . . . ."); *Colorado II*, 533 U.S. at 446 ("[T]he dollar amount of the

limit need not be 'fine tun[ed].'" (quoting *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 387-88

(2000))); *Buckley*, 424 at 30 ("[I]f it is satisfied that some limit on contributions is necessary, a court has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000." (internal quotation marks omitted)). Only if there are "danger signs" that the limits are not closely drawn will we examine the record to review the statute's tailoring. *Randall*, 548 U.S. at 249; *see Buckley*, 424 U.S. at 30 ("Such distinctions in degree become significant only when they can be said to amount to differences in kind."). We see no danger signs here. Plaintiffs' argument depends on using "simple arithmetic" to translate the Vermont contribution limits invalidated in *Randall* to imaginary biennial limits on contributions to party committees and candidates. They argue that the limit on contributions to state party committees invalidated by *Randall* is equivalent to a biennial contribution limit of $198,389 to national party committees, which they explain is about $14,000 *more* than the total amount an individual could biennially contribute to the three committees—an amount an individual still cannot contribute because of the aggregate limits. They likewise argue that if an individual wanted to contribute equally to "one candidate of his choice in all 468 federal races" in 2006, he would be limited to contributing $85.29 per candidate for the entire election cycle, an amount "far below the $200 limit held too low in *Randall*." Even granting that Plaintiffs' methodology and results are correct,[5] "the dictates of the First Amendment are not mere functions of the Consumer Price Index." *Shrink Mo. Gov't PAC*, 528 U.S. at 397. The effect of the aggregate limits on a challenger's ability to wage an effective campaign is limited because the aggregate limits do not apply to nonindividuals. *See Randall*, 548 U.S. at 236, 249 (invalidating contribution limit that

---

[5]     Their premise that the *Randall* Court struck down a "$400 limit on contributions an individual may may make, over a two-year period, to a state party committee" distorts the Court's description that the statute in question "imposes a limit of $2,000 upon the amount any individual can give to a political party during a 2-year general election cycle." 548 U.S. at 239. In any event, to compare the amount of money required to reach the national population to the amount needed to reach just the citizens of Vermont is not a matter of a mere multiplier. If direct mail were the only means, such a multiplier might work. But to take a simple example, building a website to reach a national audience is not any more expensive than building one to reach citizens of a single state. As a result, Plaintiffs are wrong to create a simple ratio of money needed to reach Vermonters over money needed to reach all Americans.

imposed a burden on First Amendment rights "disproportionately severe" to the government's legitimate interests because the limits "harm[ed] the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability"); *Buckley*, 424 U.S. at 21 (suggesting the contribution limits would be problematic if they "prevented candidates and political committees from amassing the resources necessary for effective advocacy"). And in any event, individuals remain able to volunteer, join political associations, and engage in independent expenditures. *See Wagner v. Fed. Election Comm'n*, Civ. Action No. 11-1841(JEB), 2012 WL 1255145, at *9 (D.D.C. Apr. 16, 2012) ("There is even less need for the Court to interfere with legislative judgments where the persons affected by the ban have other meaningful avenues for political association and expression.").

Plaintiffs' overbreadth challenge consists of the conclusory assertions that the aggregate limits substantially inhibit protected speech and association "not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications," and that "there is no 'scope of . . . plainly legitimate applications'" since neither political party proliferation nor movement of "massive" amounts of money through party committees or PACs to candidates is now possible. The *Buckley* Court rejected challenges that the contribution limits are overbroad because most contributors are not seeking a quo for their quid and the base contribution limit is "unrealistically low." 424 U.S. at 30. Aside from these two claims, which we join the *Buckley* Court in rejecting, Plaintiffs do not explain how the aggregate limits potentially regulate both protected *and* unprotected conduct. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (tracing the overbreadth doctrine to "concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech"); *Hill v. Colorado*, 530 U.S. 703, 731-32 (2000) (emphasizing that the overbreadth doctrine permits litigants to challenge a statute because of a "judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally

12

protected speech or expression"); *Broadrick v. Oklahoma*, 413 U.S. 601, 610-12 (1973) (explaining the overbreadth doctrine as a tool for circumventing an otherwise prohibitory standing doctrine). Plaintiffs' overbreadth argument is essentially a severability claim, but because we conclude that nothing needs to be severed, this argument fails.

Plaintiffs raise the troubling possibility that *Citizens United* undermined the entire contribution limits scheme, but whether that case will ultimately spur a new evaluation of *Buckley* is a question for the Supreme Court, not us.

## III. Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order denying Plaintiffs' Motion for a Preliminary Injunction and granting the FEC's motion to dismiss.


_____/s/_____
JANICE ROGERS BROWN
United States Circuit Judge


_____/s/_____
ROBERT L. WILKINS
United States District Judge


_____/s/_____
JAMES E. BOASBERG
United States District Judge

Date: September 28, 2012

ORDER AND FINAL JUDGMENT

For the reasons set forth in the Memorandum Opinion, it is this 28th day of September, 2012, hereby

**ORDERED** that the Defendant Federal Election Commission's motion to dismiss is **GRANTED**; it is further

**ORDERED** that the Plaintiff's motion for a preliminary injunction is **DISMISSED AS MOOT**; and it is further

**ORDERED** that final judgment be entered for the defendant.

**SO ORDERED.**

                               _____/s/_____
JANICE ROGERS BROWN
United States Circuit Judge

                               _____/s/_____
ROBERT L. WILKINS
United States District Judge

                               _____/s/_____
JAMES E. BOASBERG
United States District Judge

14